FILED
DISTRICT OF WYOMING
U.S. DISTRICT COURT

SEP 12 2006

U.S. MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
YELLOWSTONE NATIONAL PARK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> STEPHEN P. TORREY, ) <br>     Defendant. ) | 07-M-54 <br><br> CASE NO. 2:04M2004-001 |

## MEMORANDUM OF OPINION

The defendant, Stephen Patrick Torrey was charged by Complaint as follows:

    Count 1. On September 7, 2003, frighten and/or intentionally disturb wildlife, in violation of 36 C.F.R. §2.2(a)(2);

    Count 2. On September 21, 2003, frighten and/or intentionally disturb wildlife, in violation of 36 C.F.R §2.2(a)(2);

    Count 3. On September 7, 2003, with intent to cause public nuisance, created and maintained a hazardous condition, in violation of 36 C.F.R. §2.34(a)(4);

    Count 4. On September 21, 2003, with intent to cause public nuisance, created and maintained a hazardous condition, in violation of 36 C.F.R. §2/340a)(4);

    Count 5. On September 7, 2003, intentionally interfere with a government employee engaged in an official duty, in violation of 36 C.F.R. §2.32(a)(1);

    Count 6. On September 21, 2003, intentionally interfere with a government employee engaged in an official duty, in violation of 36 C.F.R. §2.32(a)(1).

The above charges are all Class B misdemeanors or petty offenses.

9-12-06

For the reasons set forth below the court finds as follows:

    Count 1:    GUILTY
    Count 2:    GUILTY
    Count 3:    NOT GUILTY
    Count 4:    NOT GUILTY
    Count 5:    GUILTY
    Count 6:    NOT GUILTY

### Facts - Counts 1, 3 and 5

On September 7, 2003, defendant left a motel in Cooke City, Montana and traveled to the approximate area of the confluence of Soda Butte Creek and Lamar River (Govt. Ex. 1). He parked his car at approximately 4:15 a.m., crossed the river and, according to his testimony, headed in a southerly direction for a group of aspen trees that he said he wanted to photograph at the base of Specimen Ridge.

On the same morning, Rick McIntyre, a National Park Service (NPS) Volunteer employee involved in the wolf project in Yellowstone National Park, was traveling to his observation post for that day. This location has been variously described in testimony as: Observation Point (Govt. Ex. 1), Enclosure Hill, Geriatric Hill and Jackson Grade. It will be hereinafter referred to as Observation Point. He noticed defendant's van parked as previously noted and continued on to set up his viewing and telemetry equipment. He first noticed defendant at 6:20 a.m. just north of a rendezvous site (RS) of the Druid Peak wolf pack (Govt. Ex. 1). He saw twelve wolves at the RS and also noticed the defendant moving toward them. He attempted to call rangers to notify them of the situation but was unable to do so. At 6:33 a.m., McIntyre noticed that the wolves were apparently reacting to defendant's presence because they began running away from him and started a "bark-howl" vocalization that McIntyre identified as indications of distress. (Although there is some discrepancy about exact times, both McIntyre and defendant agree on the relevant facts at this point.) Defendant testified that when he first noticed the wolves, he turned ninety degrees and headed away from the RS.

Defendant stopped and began taping a black female which McIntyre said seemed especially upset and responded to defendant's presence with "a lot of barks and howls." At approximately 6:45 a.m. defendant began taping wolf number 21, the alpha male of the Druid pack. Defendant testified that he shot tape of number 21 first and the black wolf second. At about this time, visitors had begun arriving at Observation Point and at some time during this incident McIntyre estimated that there were fifty people at the site to observe the wolves. After taping number 21 for some minutes, defendant began heading east toward the Lamar River. At 7:16 a.m., McIntyre lost sight of defendant in the fog (Def. Ex. A). He saw him again at 8:34 a.m. at the Lamar River (Govt. Ex. 1). Defendant disputes this and says it must have been much earlier. Defendant says he arrived back at his van around 9:30 a.m.

### Facts - Counts 2, 4 and 6

On September 21, 2003, defendant arrived at approximately 5 a.m. at the same parking area as he had on September 7, 2003. On this day, however, he was driving a different vehicle, a small white sedan with Wyoming license plates. He packed up his gear and headed for the same grove of aspen trees at the foot of Specimen Ridge. That same morning, Rick McIntyre was again heading to the Observation Point to resume his monitoring of the Druid Peak wolves. He noticed the small white car at the confluence parking area and arrived at his post at the O.P. at 6:26 a.m. He counted sixteen wolves in the RS at that time. He then saw defendant at 6:34 a.m. walking through the eroded area in a southerly direction toward the wolves. Defendant was now east of the wolves. He appeared to begin filming the wolves and apparently they did not see him for a few minutes. The wolves then noticed him and began to run toward the northwest. Defendant then began to parallel them which brought him closer to the pack (Govt. Ex. 3). The wolves were doing a lot of bark-howling and acting distressed. Defendant shot videotape of the wolves at several places along his route. McIntyre then saw defendant head north toward the Northeast Entrance highway. He stopped again and appeared to film the people at O.P. Defendant's testimony on his activity and that of the wolves

does not differ from McIntyre's in significant detail.

Defendant denies intentionally disturbing the wolves on either September 7th or 21st, 2003 and denies intentionally causing a public nuisance by creating a hazardous condition or intentionally interfering with a government employee on either day.

## Discussion

### (1) Counts 1 and 2

36 C.F.R. Sec.2(a)(2) reads as follows:

> "The following are prohibited:
>
> (1) .......
> (2) The feeding, touching, teasing, frightening or intentional disturbing of wildlife nesting, breeding or other activities."

There can be little dispute that defendant disturbed the wolves in the RS at the base of Specimen Ridge on both September 7th and 21st, 2003. The observations of Rick McIntyre, and the testimony of Paul Zajiack and Jack Bean clearly show that the wolves were very upset and disturbed by defendant's presence and actions. The videotapes entered into evidence as Govts. Exs. 5, 5A and Defs. B show beyond doubt the disruption caused by defendant to the Druid Peak wolf pack. The government's expert witness, Dr. Diane Boyd, testified during the viewing of Govt. Ex. 5, a video shot by Bob Landis, a professional film maker.

Dr. Boyd testified that the film shows that the wolves were clearly distressed and upset because of the howling and barking and the attention they paid to defendant. All the wolves were giving full attention to defendant, some staring directly at him. She testified that the "bark-howling" heard in the tape is a warning signal to each other of present danger and only occurs when wolves are agitated. Dr. Boyd said that the behavior seen in the film of the wolves banding together and touching each other is for

reassurance and to gather together in the face of possible danger. Dr. Boyd testified that rendezvous sites are very important to the wolf pack; it is a place where they feel secure in leaving their pups while out hunting. This kind of disturbance can drive them away.

For defendant to be found guilty on Counts 1 and 2, however, his actions must be found to be intentional. The court finds that they were.

On September 7th, defendant testified that he did not know the wolves were in the RS until 6:33 a.m. and he immediately made a ninety degree turn to get away from them. The question arises: If he truly wanted to extricate himself immediately from the presence of the wolves, why didn't he turn around go back the way he came? That would have been the fastest, most direct route to avoid contact with the wolves. He continued to film the wolves even as they were showing signs of distress. Defendant then paralleled the RS for approximately 30-45 minutes. Had he turned around and gone back the way he had come, he would have been away from the RS in much less time. Instead, the alpha male and an adult female shadowed him, no doubt perceiving him as still a danger and putting themselves between the danger and their pups. Defendant testified that he didn't want to go back the way he came because he wanted to make a loop. Unfortunately, that loop left him in contact with the disturbed wolves for a much longer period of time, gave him an opportunity to stop and do some taping, even though the evidence clearly shows that the wolves were very disturbed by his presence and his actions.

Defendant's actions on September 21, 2003 were much the same as his actions on September 7th. He testified that he was again heading for a grove of aspen trees. As he did on September 21, he directly approached the RS, saw and heard wolves in an obviously agitated state with much barking and howling and running around. Yet he did not turn around and return the way he came but filmed the wolves and left the area by paralleling the RS rather than seeking a more direct egress from the area.

Defendant, because of his familiarity with the Lamar Valley, knew or should have known that the Druid Pack was using that area at the foot of Specimen at what is known as a "rendezvous site"; that is, a place where the wolves feel secure and

comfortable and spend a lot of time. On both occasions, instead of avoiding that area on his way to the trees, he headed directly for it and the wolves. Defendant testified that he enjoys hiking in a loop or an arc and on both September 7th and 21st, he could have approached the area from either the east or the west and most probably avoided disturbing the wolves. If he couldn't avoid the wolves, then he needed to go find other trees to shoot.

Defendant's intent is also shown by his postings on a Yellowstone chat page. On this particular web page, defendant goes by the name "Photodude". Govt. Ex. 6 is a printout of a posting made by "Photodude" on September 7, 2003 at 6:31:58 p.m. Excerpts from this page are revealing regarding defendant's intent:

> "Somebody was in the Vous!!!!!!!----------Anyone care to guess Wous(who)? Later... "Hey Chatters, on my hike this morning there were several species of animals that vacated the immediate area I was in all though some shadowed me for quite a distance. Species fleeing were: one Swainson's hawk, sandhill cranes, twenty geese, eleven ducks, eight ravens, one sharp-shinned hawk, one Swainson's hawk, one trout (known), six antelope, and six to eight wolves."

Excerpt from web page from "Photodude" made on September 9, 2003 at 4:52:08 p.m.:

> "OK, so I raided the Vous last Sunday-no big deal. Made lots of birds and mammals vacate the immediate area I was in including wolves. The wolves actually shadowed me for quite a ways, barking up a storm, drifting in and out of the fog and getting others to howl back. It is quite exhillirating - the pre-dawn walk-about is, and such a view as the dawn breaks with the fog and early fall colors. Antelope barking at me; buffalo grunting and elk bugling - wow, what a place. I guess that is why I love it so much."

After viewing the tapes in evidence, it should be obvious that one does not need the training of a wolf biologist to detect when wolves are being agitated and disturbed and are in some distress. Certainly defendant should have known that on September 7th and 21st, 2003.

The above web page postings show that defendant seemingly has no twinge of conscience or reluctance about disturbing the wildlife of Yellowstone National Park. His intent in Counts 1 and 2 is clear.

### (2) Counts 3 and 4

In the Complaint, except for the dates, Counts 3 and 4 are identical and read in part: 'with intent to cause public nuisance, created and maintained a hazardous condition, ..."

For the defendant to be found guilty of these charges, the government must prove that the defendant, by his actions, **intended** to cause a public nuisance which thereby created and maintained a **hazardous** condition (Emphasis supplied). The government fails to do so.

The court has found that defendant had the requisite intent to disturb wolves in Counts 1 and 2. This intent is, of course, wholly separate and independent of the intent necessary for a finding of guilty in Counts 2 and 3 and cannot be assigned or delegated for that purpose. There is no evidence that defendant intended to cause anything but the disturbance of the wolves. (Certainly to the 100-125 who were attempting to observe wolves on the two days in question, he caused a great deal of anger, annoyance and futility. Many of the observers had traveled long distances to see the wolves and instead see one person in the RS agitating the animals and driving them away.)

Even if the court were to find that defendant intended to cause a public nuisance, did such action "create and maintain a hazardous condition"? The court has been unable to find any authority or definition of hazardous which would fit the facts of this case. In Webster's dictionary, hazardous is defined as: "1. of or involving chance; 2. risky; dangerous; perilous." (Webster's New World Dictionary, 2 d Ed.). Had defendant engaged in even more egregious behavior with the wolves to the degree that they felt the need to aggressively defend the pack, then certainly he would have created a hazardous condition. The evidence does not show that defendant's actions were intended to create a hazardous condition.

### 3) Counts 5 and 6

In Counts 5 and 6, defendant Is charged with "....intentionally interfere with a government employee engaged in an official duty..." There are two issues to be

resolved: (1) was Rick McIntyre a government employee on September 7 and Sept. 21, 2003; and (2) did defendant **intentionally** interfere with McIntyre while he was engaged in an official duty?"

Prior to the end of the trial, defendant filed a motion to dismiss Counts 5 & 6 because, by defendant's analysis, Rick McIntyre was not a government employee on the dates in question.

For the reasons discussed below, defendant's motion is denied.

Defendant's contention is that McIntyre was a Volunteer in The Parks (VIP) and as such was not paid by the NPS. McIntyre "....was not paid for his research on those dates, and that there was no expectation on the(sic) part that he conduct research on those dates, and that no one from the government on those dates directed him to conduct research" (Def.Brief, p.2). While the above is largely true it is not dispositive of the issue. 16U.S.C.§.18i as quoted in the government's brief on the second page provides that "volunteers are Federal employees for purposes of: the Federal Tort Claims Act, Federal Worker's Compensation and loss of their personal property." Mr. McIntyre had also been entrusted with an NPS pickup and NPS telemetry equipment, two very expensive items of government property.

Defendant further contends that there was no relationship under the law of agency between the NPS and McIntyre. Defendant quotes an excerpt from 3 Am. Jur. 2d Agency, Sec.15:

> The relationship between an agent and a principal is a contractual one, ....As between the parties to the relationship, there must be a meeting of the minds in establishing the agency, although such consent may be implied rather than expressed." (Def. Brief, p.2).

In the Volunteer in Parks Guideline, NPS-7, Release No. 3 and in the "Introduction to the Program Description, Chapter 1, page 1 it says:

> The major benefit of the program is to utilize this voluntary help in such a way that it is **mutually beneficial** to the Service and the Volunteer" (Gov. Brief, p.2.)(Emphasis supplied).

By his testimony, it is clear that although McIntyre left paid status with the NPS on

September 6, 2003, both he and the NPS wanted to continue the relationship. The Volunteers in Parks gave them the vehicle to accomplish this. He continued to do the same things on September 7th as he had been doing on September 6th. He still collected data on wolves, monitored wolves, wrote reports on wolves and educated visitors about wolves.

For purposes of 36 C.F.R. Sec. 2.32(a)(1), Rick McIntyre was an employee of the National Park Service on September 7 and September 21, 2003.

The second issue that must be addressed is whether defendant Intentionally interfered with McIntyre. On September 7th, his intent can be shown from his actions and words. Mr. McIntyre testified that he could tell defendant had a scanner and was monitoring his radio traffic by his reactions. On September 7th, McIntyre notes that defendant appears to stop and listen when he hears McIntyre talking with the communications center. Later, McIntyre keys his radio several times and each time defendant stopped and appeared to be listening to his scanner (Def.Exhib. A). Defendant testified he was aware of McIntyre's presence about 6:20 a.m., about the time he got to the RS. Defendant knew McIntyre worked for the Park Service in the Wolf project. He knew McIntyre was at his post on Observation Point. Yet he continued to walk toward the RS where the wolves were located. On September 9, 2003, defendant made an entry on The Total Yellowstone Loon Chat Page. After reciting his interaction with the wolves at the RS, defendant states:

> "Unit One (identified by defendant as Ranger McIntyre) was so Poed it was funny. He truly does think that Lamar Valley exists for his project and/or personal gratification of living out some sort of a pre-Columbian dream or Gallopagos(sic) Island thingy. Someone should have a Chat with him as to the rules of YNP - perhaps even the rule of law."

There is no doubt then, that defendant, on September 7, 2003, knew that McIntyre was observing the wolves and that he was interfering with McIntyre's duties.

There is also no doubt that defendant interfered with McIntyre's observation of wolves on September 21, 2003, but on this date there is no evidence of intent. After reviewing the record the court can find no indication that defendant knew that McIntyre was on Observation Point. Whereas, regarding September 7th, there was considerable

testimony about the scanner carried by defendant and his postings on the chat page, there is no comparable testimony about September 21st. The court can find no evidence that defendant's actions on that day were in any way intentional.

Counsel will be consulted regarding sentencing.

DATED this 12th day of September, 2006.

                                            Stephen E. Cole
                                            U.S. Magistrate Judge